No. 14-2113

_____

# United States Court of Appeals
### *for the*
# Fourth Circuit

_____

ERIN POTTS,

*Plaintiff-Appellant,*

*v.*

ADP, INC.,

*Defendant-Appellee,*

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
(NO. 3:13-cv-00344-MOC-DSC)
(HONORABLE MAX O. COGBURN, JR., JUDGE)

_____

**BRIEF OF APPELLEE ADP, INC.**

_____

Ted N. Kazaglis
*Counsel of Record*
Collin O'Connor Udell
JACKSON LEWIS P.C.
1400 Crescent Green, Suite 215
Cary, NC 27518
(919) 854-0044
Kazaglis@jacksonlewis.com

*Attorneys for Defendant-Appellee*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Fourth Circuit Local Rule 26.1, the undersigned counsel of record for the Defendant-Appellee, ADP, Inc. (known as ADP, LLC as of July 1, 2014), certifies that it has a parent corporation – ADP Atlantic, LLC, and a grandparent corporation – Automatic Data Processing, Inc., that no publicly held corporation owns ten percent or more of the stock of ADP, LLC, and that Automatic Data Processing, Inc., a publicly held corporation, has a direct financial interest in the outcome of the litigation.

# TABLE OF CONTENTS

*Page*

CORPORATE DISCLOSURE STATEMENT ........................................ *ii*

TABLE OF AUTHORITIES .............................................................. *v*

JURISDICTION............................................................................1

STATEMENT OF ISSUES .............................................................1

STATEMENT OF THE CASE...........................................................2

STATEMENT OF FACTS ...............................................................3

    I.    ADP Hired Appellant and Promoted Her to Up-Market Client District Manager. ....................................................................3

    II.    Trott Promoted Appellant to Up-Market Hunter District Manager. ..........4

    III.    Appellant's Poor Sales Performance Began in 4th Quarter of FY 2010. ..................................................................................5

    IV.    Appellant Applied for Promotion to Sales Effectiveness Manager. ..........7

    V.    Appellant's Performance Continued To Be Disappointing, and She Was Issued a Verbal Warning and PIP on January 3, 2011......................8

    VI.    Appellant Applied for Promotion to Sales Executive. ...........................12

    VII.    Appellant Received a Written Warning on April 4, 2011......................12

    VIII.    Appellant Took Medical Leave Until her Voluntary Resignation. ..........13

    IX.    Proceedings Before the District Court......................................14

SUMMARY OF THE ARGUMENT ................................................14

STANDARD OF REVIEW ...........................................................16

ARGUMENT ...........................................................................17

    I.    Appellant Has Failed To Establish a Prima Facie Case of Retaliation...............................................................................17

        A. The April 4, 2011 Written Warning Does Not Amount to an Adverse Employment Action.............................................18

*iii*

# TABLE OF CONTENTS
## (cont'd)

*Page*

B. Appellant Has Failed To Establish that the Protected Activity Was the "But For" Causal Connection to the Issuance of the Written Warning ................................................................................20

II. The District Court Properly Granted ADP an Inference of Non-discrimination. ......................................................................22

III. Appellant's Failure To Promote Based on Gender Claim Is Unavailing. ...........................................................................25

A. Appellant Cannot Establish a Prima Facie Case Because She Was Not Qualified for the Sales Effectiveness Manager Position ...........................................................................27

B. ADP Has Articulated a Legitimate Non-Discriminatory Business Reason for its Decision ......................................29

C. Appellant Has Failed To Carry her Burden of Proving that the ADP's Articulated Reasons for Not Promoting Appellant Are a Pretext for Discrimination ...............................................30

IV. Appellant Has Failed To Establish a Prima Facie Case for Disparate Discipline Based on Gender ......................................32

A. The Disciplinary Action in Question Was Not Sufficiently Substantial To Amount to Adverse Employment Action ..................32

B. Appellant Failed To Carry her Burden of Coming Forward with Evidence that ADP Treated Similarly Situated Male Employees Differently ...........................................................................36

STATEMENT IN SUPPORT OF ORAL ARGUMENT ........................................41

CONCLUSION ........................................................................................41

*iv*

# TABLE OF AUTHORITIES

*Page*

**FEDERAL CASES**

*Boone v. Goldin*,
   178 F.3d 253 (4th Cir. 1999) ...............................................................33

*Bristow v. Daily Press, Inc.*,
   770 F.2d 1251 (4th Cir. 1985) ............................................................33

*Burlington N. & Santa Fe Ry. Co. v. White*,
   548 U.S. 53 (2006)........................................................................18, 33

*Carter v. Ball*,
   33 F.3d 450 (4th Cir. 1994) ...............................................................21

*Cathcart v. Flagstar Corp.*,
   No. 97-1977, 1998 U.S. App. LEXIS 14496 (4th Cir. June 29, 1998) ........24, 25

*Collins v. American Red Cross*,
   715 F.3d 994 (7th Cir. 2013) .............................................................17

*Cook v. CSX Transp. Corp.*,
   988 F.2d 507 (4th Cir. 1993) .............................................................36

*EEOC v. Clay Printing Co.*,
   955 F.2d 936, 946 (4th Cir. 1992) ......................................................30

*Evans v. Technologies Applications & Serv. Co.*,
   80 F.3d 954 (4th Cir. 1996) ..........................................................22, 28

*Gairola v. Virginia Dep't of Gen. Servs.*,
   753 F.2d 1281, 1287 (4th Cir. 1985) ..................................................28

*Goldberg v. B. Green & Co.*,
   836 F.2d 845 (4th Cir. 1988) .............................................................22

*Haywood v. Locke*,
   387 F. App'x 355 (4th Cir. 2010)........................................................36

v

## TABLE OF AUTHORITIES
### (cont'd)

*Page*

*Holland v. Washington Homes, Inc.*,
    487 F.3d 208 (4th Cir. 2007) ...............................................................................16

*James v. Booz-Allen & Hamilton, Inc.*,
    368 F.3d 371 (4th Cir. 2004) ...............................................................................33

*Jiminez v. Mary Washington Coll.*,
    57 F.3d 369 (4th Cir. 1995) ...............................................................................30

*Lovelace v. Sherwin-Williams Co.*,
    681 F.2d 230 (4th Cir. 1982) ...............................................................................23

*Mackey v. Shalala*,
    360 F.3d 463 (4th Cir. 2004) ...............................................................................17

*McDonnell Douglas Corp. v. Green*,
    411 U.S. 792 (1973)...............................................................................26, 30

*Medina-Rivera v. MVM, Inc.*,
    713 F.3d 132 (1st Cir. 2013)...............................................................................17

*Merritt v. Old Dominion Freight Line, Inc.*,
    601 F.3d 289 (4th Cir. 2010) ...............................................................................16

*Mitchell v. Data Gen. Corporation*,
    12 F.3d 1310, 1318 (4th Cir. 1993) ...............................................................................25

*Moore v. City of Charlotte*,
    754 F.2d 1100 (4th Cir. 1985) ...............................................................................36

*O'Connor v. Consol. Coin Caterers Corp.*,
    517 U.S. 308, 312 (1996)...............................................................................25

*Othentec Ltd. v. Phelan*,
    526 F.3d 135 (4th Cir. 2008) ...............................................................................16

# TABLE OF AUTHORITIES
## (cont'd)

*Page*

*Proud v. Stone*,
  945 F.2d 796 (4th Cir. 1991) ......................................................................*passim*

*Roberson v. Alltel Info. Servs.*,
  373 F.3d 647 (5th Cir. 2004) ...............................................................21

*Smith v. Flax*,
  618 F.2d 1062 (4th Cir. 1980) ............................................................23

*Taylor v. Virginia Union Univ.*,
  193 F.3d 219 (4th Cir. 1999) ..............................................................24

*Texas Dep't of Cmty. Affairs v. Burdine*,
  450 U.S. 248 (1981)............................................................................28

*Tyndall v. National Educ. Ctrs., Inc.*,
  31 F.3d 209 (4th Cir. 1994) ................................................................22

*United States v. Evans*,
  404 F.3d 227 (4th Cir. 2005) ..............................................................32

*Univ. of Texas Sw. Med. Ctr. v. Nassar*,
  133 S. Ct. 2517 (2013)...............................................................17, 21

*Von Gunten v. Maryland*,
  243 F.3d 858 (4th Cir. 2001), ............................................................33

*Williams v. Cerberonics, Inc.*,
  871 F.2d 452 (4th Cir. 1989) ..............................................................21

*Williams v. Giant Food Inc.*,
  370 F.3d 423 (4th Cir. 2004) ..............................................................26

*York v. AT&T*,
  95 F.3d 948 (10th Cir. 1996) ..............................................................17

## TABLE OF AUTHORITIES
### (cont'd)

*Page*

*Young v. Lehman*,
    748 F.2d 194 (4th Cir. 1984) ..............................................................28

**FEDERAL STATUTES**

28 U.S.C. § 1291 ............................................................................1

28 U.S.C. §§ 1331 and 1441 ..........................................................1, 14

42 U.S.C. § 2000(e), *et seq.* ...............................................*passim*

**RULES**

Fed. R. App. P. 4(a)(1)(B) .............................................................1

## JURISDICTION

The District Court asserted jurisdiction under 28 U.S.C. §§ 1331 and 1441. This Court has jurisdiction pursuant to 28 U.S.C. § 1291. The District Court issued its Order granting ADP, Inc.'s motion for summary judgment on September 16, 2014. (JA 458-470). Appellants filed their Notice of Appeal on October 14, 2014. (JA 472-473). The appeal is timely pursuant to Fed. R. App. P. 4(a)(1)(B).

## STATEMENT OF ISSUES

(1) Whether the District Court correctly considered relevant and material facts in the light most favorable to Appellant in determining that Appellant's retaliation claim must fail because she could not establish a *prima facie* case in that there was no adverse employment action and her protected activity was not the "but for" cause of the written warning.

(2) Whether the District Court properly applied an inference of non-discrimination as supported by *Proud v. Stone*, 945 F.2d 796 (4th Cir. 1991).

(3) Whether the District Court properly ruled that Appellant failed to establish a *prima facie* case for failure to promote based on gender.

(4) Whether the District Court properly ruled that Appellant failed to establish a *prima facie* case for disparate discipline based on gender.

1

## STATEMENT OF THE CASE

"Most of our assumptions have outlived their uselessness," said Marshall McLuhan, a Canadian philosopher. DOUGLAS COUPLAND, MARSHALL MCLUHAN: YOU KNOW NOTHING OF MY WORK! 202 (2010). That is certainly true in this case. Appellant Erin Potts constructs her case on a foundation of assumptions and speculation. Indeed, there is more testimony in her brief than established during discovery. In contrast, Appellee ADP, Inc. (now known as ADP, LLC and hereafter "ADP") provides direct, uncontroverted testimony supporting the non-discriminatory, legitimate business reasons for its decisions not to award Appellant certain positions and to issue disciplinary warnings. In the face of such evidence, the tenuous foundation for Appellant's appeal disintegrates.

Appellant was a salesperson for her former employer, ADP. In 2010 and the beginning of 2011, she was not making sales. As a consequence, ADP issued Appellant a Verbal Warning and a Performance Improvement Plan ("PIP") in January 2011 due to the plunge in her job performance, and a written warning in April 2011 due to her continued poor sales performance.  Appellant was considered for two promotional opportunities but was not awarded either:  one went to a female and the other to a more qualified candidate.

Appellant filed this action against ADP, alleging that ADP discriminated against her based on gender in violation of Title VII of the Civil Rights Act of

2

1964, 42 U.S.C. § 2000(e), *et seq.*, by "failing to promote plaintiff to a position for which she was qualified"; "interfering with plaintiff's promotional opportunities"; and "imposing upon plaintiff unjust disciplinary action" when it issued her the PIP and verbal and written counseling. In a nutshell, ADP's limited actions were always justified by legitimate, non-discriminatory reasons. Indeed, the performance metrics used to evaluate her job performance are empirical and undebatable.

## STATEMENT OF FACTS

### I.     ADP Hired Appellant and Promoted Her to Up-Market Client District Manager.

ADP provides, among other things, payroll and human resources services to companies throughout the country. In June 2005, ADP hired Appellant as a Sales Trainee in ADP's Sales Department. (JA 62). This position functions as a training ground for future salespeople to learn ADP's practices and offerings until a sales position opens. (JA 63-64). Appellant was interviewed and hired by a committee including: Ken Schmidt ("Schmidt"), Vice-President of Sales, and Sales Executives David Trott ("Trott"), Pete Baney ("Baney"), David McGrath, and Pete Calamas. (JA 108-110). Initially, Appellant reported to Baney and Schmidt. (JA 65). Appellant understood she might occupy a Sales Trainee position for a year, but ADP promoted her to the position of "Up-Market Client District Manager" (Client-DM) in less than five months. (JA 64-68). Notably, ADP selected

Appellant for this position over two male trainees. (JA 65-68). As a Client-DM, Appellant was responsible for selling ADP's services to existing clients, which is significant because she was not required to obtain new clientele. (JA 68).

At the beginning of every fiscal year ("FY") (running from July to June), ADP establishes a sales plan setting forth each District Manager's sales quota ("Plan"). (JA 111, 151). Performance is measured against the Plan on a monthly basis. Each District Manager is expected to accomplish weekly activity goals to remain on target to achieve at least 100 percent of his or her annual sales Plan. Appellant understood that her success depended on meeting her Plan each year. Her expectation was that she would need to achieve her annual quota. (JA 76). In FY 2006 and 2007, Appellant achieved 102% and 129% of her Plan, respectively (JA 69), but Appellant only achieved 72% of her Plain in FY 2008. (JA 69). Appellant has admitted that, throughout this time, she frequently interacted with Schmidt and Trott yet harbored no perception or belief that she was being treated any differently based on her gender. (JA 70-71).

**II.   <u>Trott Promoted Appellant to Up-Market Hunter District Manager</u>.**

In July 2008 (the beginning of FY 2009), Trott offered Appellant a promotion from an "Up-Market Client District Manager" position to an "Up-

Market Hunter District Manager" position (Hunter-DM). (JA 72, 112).[1] Notably, Trott had personally selected her over other candidates. Appellant was now expected to originate business from prospective clients instead of servicing existing clientele. (JA 72; 112-113). In this role, Trott became her direct supervisor. (JA 75).

### III. Appellant's Poor Sales Performance Began in 4th Quarter of FY 2010.

It is uncontroverted that Trott assessed all District Managers' performance on two fronts: "lagging" indicators, or past sales performance, and "leading" indicators, or the prospecting activity required to maintain an acceptable pipeline of potential sales deals that will hopefully come to fruition. (JA 115). "Leading" indicators include a District Manager's activities in increasing the sales funnel, presence in the office, and participation in group meetings. (JA 117).

Appellant initially performed her role as Up-Market Hunter District Manager satisfactorily, meeting Plan in FY 2009 and 2010.[2] Beginning in

---

[1] Appellant attempts to argue that her selection to Up-Market District Manager was not a promotion. However, she admits that it was presented to her as a promotion and a catalyst to further promotions (JA 406-407). In addition, it is widely considered a promotion because a different commission structure is used that allows District Managers to earn substantially more money. (JA 414).

[2] Appellant would not have met her goal for fiscal year 2010 if she was not credited with nearly $200,000 of bad business, leaving her with achieving only 92% of plan. (JA 121). In fiscal year 2010, Appellant was credited with achieving 111% of Plan due in part to the credit of this bad business.

approximately fourth quarter of FY 2010 (April through June 2010), however, Trott became concerned about Appellant's sales efforts. (JA 115). While she finished the fiscal year above Plan, the majority of the work that led to that end result was done earlier in the year. Indeed, Appellant realized only 37% of her fourth quarter expectations. (*Id.*).[3]

Accordingly, Trott began to verbally coach her at this time, warning her that a slow end to fiscal year 2010 could translate into a slow start to the beginning of fiscal year 2011. (JA 119-120). Sure enough, Trott's premonition came to be. Fiscal year 2011 (beginning July 2010) was not a positive one for Appellant. She continued to miss expectations. For example, in September 2010, Appellant only achieved 22% of Plan, and in October 2010 Appellant was negative 4% of Plan. (JA 80). Appellant was drastically underperforming in her role as Hunter-DM.

---

[3] In her brief, Appellant continues to ignore the facts and make assumptions. She states in her brief that "Trott allegedly used weekly Sales Boards to evaluate DMs." Appellant's Brief ("AB") 50. This is not an allegation. This is undisputed testimony by Trott demonstrating that he applied the same criteria to all DMs. Furthermore, Appellant focuses on her Fiscal Year 2010 year end number of 111% of Plan, but ignores the fact that Trott's concerns were her very slow finish to Fiscal Year 2010 compared to others and the fact that her percentage was only reached because of credit for bad business. (JA 120-121). Instead of addressing these concerns, Appellant tries to use the 2010 year-end Sales Board, (JA 427), to draw assumptions from the numbers. This does not provide a full picture of her sales situation at that time, particularly in light of Trott's direct, undisputed testimony regarding his concerns about Appellant's slow finish to Fiscal Year 2010.

More importantly, she was not performing the sales activity necessary to stock her pipeline. (JA 120, 122, 127-129).

**IV.    Appellant Applied for Promotion to Sales Effectiveness Manager.**

In October 2010, while below her yearly sales quota due to a pending "no start," *see infra* note 4, Appellant applied for a Sales Effectiveness Manager ("SEM") position. (JA 73-74). Notably, Trott helped Appellant prepare for the interview and provided her with the necessary endorsement for the role. (JA 136). Ken Powell ("Powell"), then Sales Effectiveness Director, interviewed Appellant for the position on October 22, 2010. (JA 177-178). At the time, Powell led a team of six (6) employees, four (4) SEMs and two (2) Sales Competitive Managers. (*Id.*). Out of his six (6) team members, half were female. (*Id.*).

Powell submitted an *uncontested* declaration, (JA 177-178), averring that he considered the same non-discriminatory criteria for all candidates: the candidates' performance in the interview, their ability to articulate a 30-60-90 day plan for the position, their work performance to date, and history and feedback from their current manager if they were a current ADP employee. (*Id.*).

Powell interviewed three ADP employees for the position: Matt McBreen, Richard Coffey, and Appellant. (*Id.*). In November 2010, Powell offered the positions to Matt McBreen and Richard Coffey who were better qualified and performing their current roles well, in contrast to Appellant. (*Id.*). Powell was the

7

ultimate decision maker, and he did not base his decision on gender, but strictly on qualifications and the interview process. (*Id*.).

Powell spoke with Appellant on November 29, 2010 to inform her of his decision. (*Id*.). Appellant took it well and appreciated his feedback. (*Id*.). Appellant did not depose Powell, the ultimate decision maker and his declaration is undisputed. Notably, Appellant testified that at this time she did not feel that anyone at ADP treated her differently in any respect due to her gender. (JA 70, 75).

## V.    Appellant's Performance Continued To Be Disappointing, and She Was Issued a Verbal Warning and PIP on January 3, 2011.

Although ADP traditionally experiences the most sales in November of each year, Appellant only achieved 10% of Plan. (JA 79). Her sales for November 2010 totaled $7,200, measured against a quota of $69,000. (*Id*.). As of December 2010 – halfway through FY 2011 – Appellant was at *ZERO percent* of her annual Plan.[4] (JA 78-81). In fact, Appellant made no new sales in December against a $45,400 monthly Plan. (JA 78). It is uncontroverted that no other Hunter-DM was performing as poorly, and therefore, there are no employees comparable to Appellant.

---

[4] In October of 2010 Appellant's sales numbers were corrected to reflect a $130,000 as a result of a deal Appellant was credited for but did not close in FY 2010, named in the ADP lexicon as a "no start." (JA 81).

Not surprisingly, Trott issued Appellant a Verbal Warning and PIP on January 3, 2011. (JA 82; 121-122; 197-198). In the Verbal Warning, Trott set forth a number of goals and expectations Appellant would be required to meet over the following months in regards to building her pipeline and sales activity. Specifically, the PIP provided:

> During our plan and reviews, we have had discussions regarding your performance. The issues below were discussed with you as well as the severity of these issues and the need for you to correct them immediately:
> - You are currently at .8 on a plan of $297,000
> - You are averaging .7 First calls a week for the past 25 weeks.
> - You currently have nothing scheduled for December and 1 first call in the past 4 weeks.
> - Your newest add to the funnel is over 50 days old and that was a lead from SBS.
> - Lack of visibility in the office and team meeting.
>
> The expectations that were set for you and the team are:
> - Above plan sales performance. Monthly, Quarterly & Annually.
> - 3-5 First appointments per week.
> - Quoting 3x your monthly quota.
> - Regular attendance to team meetings.

(JA 197-198). Trott went on to list eight bullet points of legitimate, objective tasks requiring immediate and sustained improvement. (*Id*.). Appellant was warned that failure to achieve such improvement could lead to further disciplinary action. (*Id*.).

Appellant herself affirmed the precarious position in which her sales performance and activities had placed her. Instead of signing the PIP as presented to her, Appellant requested Trott to revise it to include her December 15, 2010 e-

mail entitled "My plan for the rest of the year." (JA 122). Appellant drafted this e-mail to Trott two weeks earlier in response to his request that she create a business plan to salvage the remainder of her fiscal year. (*Id*.). Appellant understood that to make Plan she needed "at least 110K"[5] every month for the rest of the fiscal year, and the e-mail confirmed her status as an underperformer. (JA 133-134; 197-198). Trott revised the PIP, and Appellant signed it on January 3, 2011. (JA 84; 197-198).

Comparably, Appellant's performance lagged far behind her peers. In December 2010, the other two female members on Trott's team, Felicia Richardson and Holly Gillis, far outpaced Appellant's sales efforts. Richardson was at 129% of her annual quota, and Gillis was at 83%. (JA 413). Other District Managers reporting to Trott in FY 2011 included Rob Willett ("Willett") and Tony Holland ("Holland"). (JA 122-124). Although also under Plan, Willett and Holland were not even close to Appellant's lagging indicator of *zero* percent of sales for the year. (*Id*.). Appellant was by far the worst performer.

In addition, Willett's leading indicators (i.e., his funnel) in December 2010 supported the notion that within 30 days he was going to be over Plan, and indeed, the following month he achieved 102% of Plan year-to-date. (JA 124). Also,

_____

[5] Appellant's monthly Plan was nowhere near the $110,000 she herself designated. This was a number set by Appellant with the hope that she could achieve with absolutely no funnel to support it.

10

Willett's historical performance comforted Trott as he had reached President's Club for the last 12 years. (JA 124-125). Nonetheless, Trott verbally coached Willett. (JA 123-124). After this verbal coaching, Willett never again sunk below Plan and ended fiscal year 2011 again achieving President's Club. (JA 125).

Furthermore, Holland at the time was in the midst of a sales upswing. (JA 146-147). From December 2010 to February 2011, his sales performance (lagging indicator) went from 40% to 80%, in addition to having the largest funnel (leading indicator) on Trott's entire team. (*Id*.). Holland had also achieved 140% of Plan the previous year, making President's Club. (*Id*.). Therefore, Appellant's position of zero percent of Plan and little in her funnel was far below that of her peers.

Unfortunately, Appellant admittedly did not meet the expectations set forth in her PIP. (JA 83; 139; 207-208). Over the three months following the PIP, there was no meaningful improvement in performance. In January 2011, she failed to originate any sales. (JA 139-140; 207-208). In February 2011, she was able to make one sizeable sale, but in March, she was again at $300 in sales compared to a $41,000 monthly quota. (JA 140-141; 207-208). Just as importantly, her leading indicators were still poor; she had only ten self-generated appointments from January through March compared to the three per week set forth in her PIP. (JA 141-142, 207). Also, her engagement in the position seemed to have waned. Despite being markedly behind her Plan, Appellant decided to use all of her

11

vacation time and float time, in addition to missing work due to sick days. (JA 143).

## VI.   Appellant Applied for Promotion to Sales Executive.

In late March 2011, while Appellant was at 60% of Plan,[6] she applied for a Sales Executive position.[7] (JA 137). Although the application period for the position had closed, Appellant was permitted to apply. (*Id*.). Out of five (5) individuals interviewed, three (3) were males and two (2) were female. Trott, Schmidt, Baney, and Mariza Hopkins, ADP Human Resources, constituted the interview committee, (*id*.), and Appellant was interviewed on April 1, 2011. Ultimately, the interview committee selected Elizabeth Morgan (female) for the position. (*Id*.).

## VII.   Appellant Received a Written Warning on April 4, 2011.

Because Appellant failed to show any discernable improvement, Trott issued Appellant a Written Warning on April 4, 2011. (JA 138; 207-208). Specifically, Appellant's year-to-date sales performance was only at 58% after three quarters of

---

[6] The only reason Appellant's numbers were even this good is because in January 2011 she received a credit for $144,000 in sales due to a positive audit, and not as a result of her recent efforts. (JA 144). A positive audit is when a previous sale is reevaluated (normally six months later) to ensure the District Manager was given proper credit for the value of the sale. (JA 144-145). Trott helped ensure that the audit was performed so that Appellant would be credited. (JA 145). In this case, the sales work was performed in FY 2010.

[7] On or about March 7, 2011, Appellant filed her first EEOC charge. (JA 424).

12

the 2011 fiscal year;[8] Appellant only had 16 total appointments over a 13-week period when she was required to have at a minimum three (3) per week; Appellant had only added three (3) new opportunities to her funnel, none of which were self-generated, which would not put her in a position to achieve Plan; and Appellant continued to miss almost 50% of Friday meetings and was not making herself visible in the office. (JA 138-142; 207-208). Again, Trott specifically listed the areas that Appellant was required to improve upon in the Written Warning. (*Id.*). This time, Appellant refused to sign the written warning. (JA 138). Appellant instead e-mailed Trott and stated that she refused to sign the Written Warning due to her pending EEOC charge. Trott had no recollection of ever receiving notice of the EEOC Charge until Appellant informed him via her e-mail. (JA 135). Clearly, Appellant had not taken the verbal warning seriously, and this was the reason Trott took the next step to a written warning.

## VIII.    Appellant Took Medical Leave Until her Voluntary Resignation.

Shortly thereafter, on April 14, 2011, Appellant left work on medical leave as recommended by her primary care physician. (JA 58). Appellant remained out of work on medical leave until her voluntary resignation on January 23, 2012. (JA 57).

---

[8] Again, the positive audit artificially increased Appellant's sales numbers for FY 2011.

## IX.    Proceedings Before the District Court.

This case was originally filed in Mecklenburg County, North Carolina Superior Court on April 30, 2013.  (JA 15-29).  ADP removed the case to the federal court for the Western District of North Carolina on June 4, 2013, based on federal question jurisdiction under 28 U.S.C. §§ 1331 and 1441.  (JA 10-12).  On June 6, 2014, ADP filed its Motion for Summary Judgment on all counts.  (JA 7, Docket Entries ("DE") 48, 49).  On June 23, 2014, Appellant submitted her response brief, and on July 10, 2014, ADP submitted its reply brief (JA 7, DE 50, 54).  The District Court issued its Order and Opinion on September 16, 2014.  (JA 458-470).  This appeal followed.

## SUMMARY OF THE ARGUMENT

This Court should affirm the District Court's order granting ADP's motion for summary judgment.  The District Court correctly considered relevant and material facts in the light most favorable to Appellant in determining that Appellant's retaliation claim must fail because she could not establish a *prima facie* case in that there was no adverse employment action and her protected activity was not the "but for" cause of the written warning.  In the retaliation context, the verbal warning and written warning issued to Appellant would not dissuade a reasonable person in these particular circumstances from making or supporting a charge of discrimination.  Appellant had been counseled for months,

14

issued a verbal warning, placed on a PIP, and then issued a written warning all for the same problem – continued poor performance. Furthermore, the filing of her EEOC charge was not the "but for" cause of the written warning. The written warning was the result of a long process of performance counseling. Appellant was receiving a written warning EEOC charge or no EEOC charge.

With respect to Appellant's failure to promote claim, the District Court properly ruled that Appellant failed to establish a *prima facie* case for failure to promote based on gender. There were two promotional opportunities – one in October 2010 and one in April 2011. Appellant has provided no evidence that gender played a role in filling the October 2010 position. In fact, ADP has provided undisputed evidence from the ultimate decision maker, Powell, that he applied legitimate, nondiscriminatory criteria in making the decision, and Appellant has nothing to refute that evidence. The April 2011 position, which Appellant has abandoned, was awarded to a female defeating Appellant's *prima facie* case.

The District Court also properly ruled that Appellant failed to establish a *prima facie* case for disparate discipline based on gender. The discipline did not amount to adverse employment action in that Appellant did not suffer any loss of pay, benefits, or promotional opportunities. In addition, Appellant was the worst performer on Trott's team and therefore is not similarly situated with others

outside the protected class. Appellant cannot demonstrate that she was treated differently than other male employees.

Layered on top of all of these allegations is the fact that the District Court properly applied an inference of nondiscrimination pursuant to *Proud v. Stone*, 945 F.2d 796 (4th Cir. 1991). Trott was part of the team that hired Appellant, supported her in her promotional opportunities, supervised her, recognized her for her achievements, and ultimately disciplined her when her performance declined. Therefore, the District Court's order should be affirmed.

## STANDARD OF REVIEW

This Court reviews a district court's grant of summary judgment *de novo*, applying the same standard as did the district court, resolving all factual disputes and drawing all reasonable inferences in favor of the non-moving party. *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 213 (4th Cir. 2007). Under that standard, summary judgment is appropriate when "there is no genuine issue as to any material fact." *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 295 (4th Cir. 2010).

It is well settled that conclusory assertions and unsubstantiated speculation are insufficient to stave off summary judgment. *See, e.g., Othentec Ltd. v. Phelan*, 526 F.3d 135, 140 (4th Cir. 2008) ("The nonmoving party cannot create a genuine issue of material fact through mere speculation or the building of one inference

16

upon another.") (citation and internal quotation marks omitted); *accord Collins v. American Red Cross*, 715 F.3d 994, 997 (7th Cir. 2013) ("[W]e will not draw inferences 'that are supported by only speculation or conjecture.'") (citation omitted); *Medina-Rivera v. MVM, Inc.*, 713 F.3d 132, 136 (1st Cir. 2013) ("Medina cannot rely on speculation to avoid summary judgment."); *York v. AT&T*, 95 F.3d 948, 955 (10th Cir. 1996) ("mere assertions and conjecture are not enough to survive summary judgment.")).

## ARGUMENT

### I. Appellant Has Failed To Establish a Prima Facie Case of Retaliation.

To make a prima facie case of retaliation, Appellant must show that: (1) she engaged in a protected activity; (2) her employer acted adversely against her; and (3) a causal connection existed between her protected activity and the adverse action. *Mackey v. Shalala*, 360 F.3d 463, 469 (4th Cir. 2004). Moreover, the Supreme Court has held that the standard for causation under a Title VII retaliation case is the "but-for" standard of traditional tort law, not the "motivating factor" standard used in Title VII discrimination claims. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013). Appellant argues the April 4, 2011 written warning was issued in retaliation for her filing an EEOC charge. Thus, Appellant must establish that but for engaging in protected activity, ADP would not have issued the Written Warning. This she has failed to do.

**A.     The April 4, 2011 Written Warning Does Not Amount to an
Adverse Employment Action.**

The anti-retaliation provisions under Title VII do not protect individuals from all retaliation, but only from retaliation that produces an injury or harm. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006). Appellant must show that a reasonable employee would have found the challenged action materially adverse and harmful to the point that it could well dissuade a reasonable worker from making or supporting a charge of discrimination. *Id*. The Supreme Court has instructed that the particular circumstances in any given situation must be considered when determining whether an adverse employment action occurred:

> We refer to reactions of a *reasonable* employee because we believe that the provision's standard for judging harm must be objective. An objective standard is judicially administrable.…We phrase the standard in general terms because the significance of any given act of retaliation will often depend upon the particular circumstances.

*Id*. at 68-69 (emphasis in original).

Taking into consideration the particular circumstances surrounding Appellant at the time she was issued the written warning, one sees an employee who was well into the corrective action process before any EEOC charge was filed. For more than 100 days prior to the written warning, Appellant had been counseled, given a verbal warning, and placed on a performance improvement plan.  (JA 197, 207).  The fact that her performance was poor and that management was concerned

18

about it was no surprise. Indeed, the fact that she would be issued a written warning on April 4, 2011 after failing to show significant improvement since being placed on the PIP 90 days before was no surprise.

Furthermore, Appellant fails to demonstrate how the written warning was in any way materially adverse or harmful to her. She had been provided the opportunity to interview for two promotions during the previous six months. (JA 73-74, 137). With respect to the second opportunity in March 2011, Appellant was allowed to interview for the position even though the application period had technically closed. Appellant has not alleged, nor is there any evidence of, any other promotion she sought or that she was prevented from applying for. The ADP Policy referred to by Appellant does not set out any minimum period of time during which an associate may not be eligible for promotion while under a corrective action. (JA 258). Put simply, Appellant relies on assumptions and speculation that somehow a job posting would appear that she wanted to apply for and that she would not be permitted to apply. But these are not the facts. The written warning was not materially adverse and harmful to the point that it could well dissuade a reasonable worker from making or supporting a charge of discrimination.

Moreover, a reasonable worker would have expected that when she was placed on a PIP on January 3, 2011, and was informed that improvement must be

"immediate and sustained or further disciplinary action up to and including a formal written warning" would be taken, and when she failed to improve during the next 90 days, that a written warning was the next logical step, not an unexpected, harmful, adverse employment action. Appellant cannot establish that an adverse employment action occurred and has failed to meet her prima facie case.

### B.     Appellant Has Failed To Establish that the Protected Activity Was the "But For" Causal Connection to the Issuance of the Written Warning.

Appellant must establish that ADP would not have issued the Written Warning "but for" the fact that it was trying to retaliate against Plaintiff for engaging in protected activity. Appellant was given her Written Warning on April 4, 2011 (after her protected activity) for the very same problems for which she was counseled, issued a Verbal Warning, and placed on a PIP on January 3, 2011 (months before her protected activity). (JA 197-198, 207-208). The April 4, 2011 written warning was simply a follow-up to Plaintiff's earlier performance problems. This was nothing new or surprising. It was not retaliatory; rather, it was further discipline for continued performance problems.

Appellant also mischaracterizes Trott's knowledge at the time he issued the written warning. Trott testified he was not aware of the EEOC charge until Appellant herself told him in an e-mail. In fact, Appellant's own e-mail confirms that she also believed that Trott had no knowledge of the EEOC charge:

> I am writing this because I am fearful that you may not have
> been informed of some of the events that have transpired in the
> past few months and I want to make sure that I am as open with
> you so that you are aware of everything going on and do not
> place yourself in any situation without being aware.

(JA 350).

Appellant can produce no probative evidence of retaliation, and in any event, "mere knowledge" of an employee's protected activity "is not sufficient evidence of retaliation to counter substantial evidence of legitimate reasons for adverse personnel action against that employee." *Carter v. Ball*, 33 F.3d 450, 460 (4th Cir. 1994) (citation and internal quotation marks omitted); *see also Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir. 1989) ("[M]ere knowledge on the part of an employer that an employee it is about to fire has filed a discrimination charge is not sufficient evidence of retaliation to counter substantial evidence of legitimate reasons for discharging that employee."), *abrogated on other grounds by Nassar*, 133 S. Ct. at 2534. Timing is unlikely to defeat a non-retaliatory explanation on its own, *see Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 655-56 (5th Cir. 2004), and it does not do so here. Simply put, the circumstances and timing of the written warning do not carry the heavy burden of proving that the written warning was the "but for" result of Appellant's protected activity.

## II.    The District Court Properly Granted ADP an Inference of Non-discrimination.

Appellant's argument that *Proud v. Stone* does not apply to this case ignores decades of case law supporting ADP's position.  In *Proud v. Stone*, this Court recognized that when the individual who hires an employee is the same person who discharges that employee, a strong inference arises that discrimination was not a determining factor for the adverse action, because the idea that an employer would act on discriminatory animus in termination, but not in hiring, makes no sense. 945 F.2d 796, 797-98 (4th Cir. 1991). Thus, employers who knowingly hire workers within a protected group seldom will be credible targets for charges of pretextual firing.  *Id.*; *see also Tyndall v. National Educ. Ctrs., Inc.*, 31 F.3d 209, 215 (4th Cir. 1994).

Appellant contends, based on citations to incomplete deposition testimony and bald assumptions, that Schmidt, as opposed to Trott, hired Plaintiff in 2005, and accordingly, ADP is not entitled to the inference that Trott's motivation for disciplining Appellant was non-discriminatory.[9] (AB 33). But the evidence in the

---

[9]  Appellant's argument relies upon snippets of incomplete testimony and assumptions to conclude that "Trott probably didn't even interview Potts because he was not in sales leadership at the time that Potts was hired on June 13, 2005." AB 34.  This assertion is wholly speculative and insufficient to create a genuine issue of fact.  *See Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 959 (4th Cir. 1996) (Evans's "own naked opinion, without more, is not enough to establish a prima facie case of []discrimination.") (citation and internal quotation marks omitted); *Goldberg v. B. Green & Co.*, 836 F.2d 845, 848 (4th Cir. 1988)

record contravenes this argument. It is undisputed that Appellant was interviewed *and hired* by a committee including: Schmidt, Trott, Pete Baney, David McGrath, and Pete Calamas. (JA 108-110). Each of these individuals interviewed and evaluated Appellant as a candidate for the position. (JA 108). Trott's sworn testimony further confirms that Schmidt, Trott, Baney, McGrath, and Calamas were collectively involved in hiring Appellant "because the trainee could work for any sales executive on any team." (JA 108). It is a quantum leap of logic to infer that the members of the committee who:

- Hired Appellant;

- Supervised Appellant;

- Recognized Appellant's achievements;

- Promoted Appellant;

- Recommended and endorsed Appellant for additional promotions; and

- Selected Appellant to interview over others (after the position closed) for the Sales Executive Position,

did so only so that they could discriminate against her later when Trott disciplined her because of legitimate concerns about her performance. Indeed, it is this

_____

(same); *Lovelace v. Sherwin-Williams Co.*, 681 F.2d 230, 245 (4th Cir. 1982); *Smith v. Flax*, 618 F.2d 1062, 1067 (4th Cir. 1980).

23

"*irrational*" premise that this Court recognized in *Proud v Stone* in holding that "a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer." 945 F.2d at 797-98.

Appellant wholly overlooks the promotions, the pay raises, and the awards she obtained while reporting to Trott. It defies logic to assert a claim of discrimination against the person (Trott) who has consistently helped one to succeed in one's career.[10] A case citing *Proud v. Stone* in a similar circumstance held that "it strains credulity to believe that [Supervisor] would have falsely rated [Plaintiff] as marginal in one category in her performance evaluation only eight months after he recommended that she be hired, so that he could prevent her from being promoted to the rank of corporal because she was a woman." *Taylor v. Virginia Union Univ.*, 193 F.3d 219, 231 (4th Cir. 1999).

Even if this Court were to find that Trott's role in hiring Appellant somehow did not entitle ADP to a *Proud v. Stone* inference, this Court, following *Proud v. Stone*, has acknowledged that a primary decision maker includes a decision maker in charge of promoting the claimant, such as Trott. *See, e.g., Cathcart v. Flagstar Corp.*, No. 97-1977, 1998 U.S. App. LEXIS 14496, at *37-38 (4th Cir. June 29, 1998) (holding that the *Proud v. Stone* presumption of nondiscrimination applied

---

[10] Appellant admits that she frequently interacted with Schmidt and Trott yet harbored no perception or belief that she was being treated any differently based on her gender. (JA 70-72).

because even though the plaintiff was not hired by Brown, the primary decision maker in this case, the plaintiff was promoted by Brown).

For example, in *Mitchell v. Data Gen. Corporation*, the appellant argued that *Proud v. Stone* should not be applied because the decision maker did not hire Mitchell, but instead only offered him a lateral move. 12 F.3d 1310, 1318 (4th Cir. 1993), *modified on other grounds by O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312 (1996). This Court acknowledged, "As we said in *Proud v. Stone*, there is nothing preventing a court from looking … to determine if the moves were in fact a 'shell game' to avoid liability. . . . If [the decision-maker] had wanted to discriminate on the basis of age, it would have been much easier for him to do so in June 1990 when he hired Mitchell, rather than in November 1990, when he fired Mitchell." *Id.* (affirming the district court's ruling in favor of the employer because the plaintiff failed to carry the ultimate burden of persuasion in the face of the employer's nondiscriminatory explanation by establishing a genuine issue of material fact). In sum, based on applicable law and the undisputed testimony of Trott and Schmidt, the District Court properly applied the inference of non-discrimination as enunciated in *Proud v. Stone*.

## III. Appellant's Failure To Promote Based on Gender Claim Is Unavailing.

Appellant has not presented any direct evidence of discrimination in her failure to promote due to gender claim. Absent direct evidence, Appellant's failure

to promote claims are subject to the *McDonnell Douglas* three-step burden shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). To establish a *prima facie* case of failure to promote, Appellant must establish that: "(1) she is a member of a protected group, (2) there was a specific position for which she applied, (3) she was qualified for that position, and (4) [ADP] rejected her application under circumstances that give rise to an inference of discrimination." *Williams v. Giant Food Inc*., 370 F.3d 423, 430 (4th Cir. 2004). If the Appellant establishes a *prima facie* case of discrimination, the burden of production shifts to the employer to rebut the Appellant's *prima facie* case by articulating a legitimate, non-discriminatory reason for the adverse employment action. *See McDonnell Douglas*, 411 U.S. at 802. If the employer articulates a legitimate, non-discriminatory reason for the employment action, the Appellant bears the burden of proving that the employer's articulated reason is a pretext for discrimination. *Id.* at 804. The District Court correctly decided that Appellant cannot establish that she was qualified for the Sales Competitive Manager position. Moreover, even if Appellant has established a prima facie case (which she has not), ADP has provided legitimate, non-discriminatory business reasons for the decision. Furthermore, there is no evidence establishing pretext.

### A. Appellant Cannot Establish a Prima Facie Case Because She Was Not Qualified for the Sales Effectiveness Manager Position.[11]

Appellant's argument that she was qualified for the Sales Effectiveness Manager ("SEM") position is easily overcome, as the District Court astutely found, inasmuch as Appellant presented no evidence (beyond her own speculation) that would support a finding that gender played any role in ADP's decision not to promote her to the position. Powell, the ultimate decision maker,[12] uncontrovertedly declared that the decision to select others for the position was based on legitimate, non-discriminatory criteria applied equally to all candidates, and Appellant was not the most qualified for the position based on those criteria. In fact, Appellant testified that at this time she did not feel that anyone at ADP treated her differently in any respect due to her gender. (JA 70, 75).

Appellant simply has not adduced any evidence that she was the more qualified candidate. It is uncontroverted that Powell interviewed and hired for the SEM position based on the candidates' performance in the interview, their ability

---

[11] Apparently Appellant has abandoned any argument that she was unlawfully denied the promotion to the Sales Executive position for which she was interviewed in April 2011 since she has not argued such in her brief.

[12] In a self-contradicting manner, Appellant states on page 38 of her Brief that "Ken Powell, ADP Sales Effectiveness Director, was the decision-maker for these positions." and then on page 40 states that "Ken Powell allegedly was the decision-maker." It is undisputed that Powell was the ultimate decision-maker.

to articulate a 30-60-90 day plan for the position, their work performance, and history and feedback from their current manager – all non-discriminatory reasons. At the time Appellant interviewed for the SEM position, she was being verbally coached by Trott regarding her performance in her current role. This Court has held that "[j]ob performance and relative employee qualifications are widely recognized as valid, non-discriminatory bases for any adverse employment decision." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960 (4th Cir. 1996); *see also Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 258-59 (1981); *Young v. Lehman*, 748 F.2d 194, 198 (4th Cir. 1984). Appellant has nothing with which to refute Powell's uncontroverted declaration, other than her own conjecture; she cannot show how she was better qualified for the position. *See Evans*, 80 F.3d at 960 (citing *Gairola v. Virginia Dep't of Gen. Servs.*, 753 F.2d 1281, 1287 (4th Cir. 1985)); *Young*, 748 F.2d at 198 ("The rule in this circuit is that where relative qualifications are advanced as the non-discriminatory reason for an employment decision, the plaintiff has the burden of establishing that she was better qualified than the successful applicant.").

Appellant attempts to create an issue of fact by taking a myopic view of the job description and claiming she was better qualified than McBreen, one of the

other candidates.[13]  The experience section of the Job Description states that "3-5 [years of] successful sales experience is required. President's Club winner preferred." (JA 309-311).  Appellant then states that she had five (5) years of sales experience and four (4) President's Club awards, and therefore, she was qualified. Appellant ignores the other 95% of the Job Description in terms of qualifications, experience, and skills. Appellant also continues to ignore the fact that Powell decided she was not the most qualified after interviewing her based on non-discriminatory criteria.  Appellant simply was not qualified for the position, and the decision was based on her performance, or lack thereof, at that time, which aside from Appellant's own unsupported speculation is undisputed.[14]

### B.    ADP Has Articulated a Legitimate Non-Discriminatory Business Reason for its Decision.

As noted, Powell, the ultimate decision maker, undisputedly applied objective performance-based criteria. *See supra* p. 7. Powell considered the same

---

[13] Apparently Appellant has abandoned her argument that she was better qualified than Richard Coffey, the other candidate for the position, since she has not argued it in her Brief.

[14] Appellant also argues that the District Court erred when it held that Appellant had not satisfied the fourth element of her *prima facie* case in relation to the SEM promotion. However, Appellant misreads the District Court's decision in that the District Court held that Appellant did not satisfy the fourth element in relation to the Sales Executive promotion since a female was promoted to that position. In any event, Appellant has abandoned her claim that she was unlawfully denied the Sales Executive position.

non-discriminatory criteria for all candidates: the candidates' performance in the interview, their ability to articulate a 30-60-90 day plan for the position, their work performance to date, and history and feedback from their current manager if they were a current ADP employee. *Id.* There is nothing in the record to dispute this. Furthermore, there is absolutely no indication that gender was a factor in the decision to award the position to other more qualified candidates. Indeed, Appellant does not even contest in her brief that ADP articulated legitimate, non-discriminatory business reasons for its decision.

#### C.    Appellant Has Failed To Carry her Burden of Proving that the ADP's Articulated Reasons for Not Promoting <u>Appellant Are a Pretext for Discrimination</u>.

Appellant also has the burden of showing that the stated reason for the decision is a pretext for discrimination and that ADP intentionally discriminated against her based on her gender. *See McDonnell Douglas Corp.*, 411 U.S. at 804. The crucial issue in a Title VII action is an unlawfully discriminatory motive for an employer's conduct, not the wisdom or folly of its business judgment. *See Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 377 (4th Cir. 1995) (citing *EEOC v. Clay Printing Co.*, 955 F.2d 936, 946 (4th Cir. 1992)). A review of the established facts, rather than Appellant's ungrounded speculation, leads to the ineluctable conclusion that there is no basis for finding pretext. Indeed, the record reflects the existence of a non-discriminatory process. The following facts demonstrate a lack of pretext:

30

1. Appellant was hired over other male applicants. (JA 65-68).

2. Appellant was promoted during her employment. (JA 72, 112).

3. Powell selected Appellant as one of three candidates to interview for the SEM position from an applicant pool of forty-three. (JA 315-318). It is illogical that Powell would select Appellant out of forty-three applicants just so he could discriminate against her at a later time.

4. Trott assisted Appellant in preparing for the SEM interview. (JA 136).

5. Powell, the ultimate decision maker, undisputedly applied objective performance-based criteria to all candidates. (JA 177-178).

6. Appellant herself testified that at this time she did not feel that anyone at ADP treated her differently in any respect due to her gender. (JA 70, 75).

Appellant argues she was qualified for the position because she made President's Club more times than McBreen did. As stated above, this is based on a myopic view of the job requirements that fails to take into consideration the totality of the circumstances, as Powell did.

Appellant also attempts to make what appears to be a "cat's paw" argument. Appellant states that since one of the criteria used by Powell was input from the employee's current manager, since Trott was Appellant's manager at the time, and since Appellant has alleged Trott engaged in discriminatory discipline and retaliation (all which allegedly occurred after the SEM promotion opportunity),

then discriminatory animus must have been part of the decision. First, Appellant has never made this argument in this case, and it should not be considered on appeal. *United States v. Evans*, 404 F.3d 227, 236 n.5 (4th Cir. 2005). In the alternative, neither of these factors, even if true, demonstrates pretext or discriminatory animus. There is absolutely no indication that gender was a factor in the decision to award the position to other more qualified candidates, and Appellant has failed to demonstrate pretext.

## IV. Appellant Has Failed To Establish a Prima Facie Case for Disparate Discipline Based on Gender.

The District Court correctly found that Appellant's claims related to alleged unjust disciplinary measures failed for two reasons: (1) Appellant cannot show that she was subject to an adverse employment action to support any cause of action; and (2) Appellant failed to carry her burden of adducing evidence that the disciplinary measures enforced against her were more severe than those enforced against other similarly situated male employees.

### A. The Disciplinary Action in Question Was Not Sufficiently Substantial To Amount to Adverse Employment Action.

The only corrective actions ADP took with respect to Appellant were a Verbal Warning on January 3, 2011 and a Written Warning on April 4, 2011. For either of these actions to amount to an "adverse employment action," Appellant must show that the discipline resulted in an adverse effect on her employment.

32

This the District Court held that Appellant could not do, and her claim should be dismissed on that basis alone.

Indeed, "employment discrimination laws require as *an absolute precondition to suit that some adverse employment action* have occurred." *Bristow v. Daily Press, Inc*., 770 F.2d 1251, 1255 (4th Cir. 1985) (emphasis added). An "[a]dverse employment action includes any . . . act . . . if, but only if, that act . . . results in an adverse effect on the 'terms, conditions, or benefits' of employment." *Von Gunten v. Maryland*, 243 F.3d 858, 866 (4th Cir. 2001) (citation and internal quotation marks omitted), *overruled on other grounds by Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 67-68.  In other words, the action must be dismissed if a plaintiff cannot specifically point out how she was injured from the employment action.  While "[c]onduct short of ultimate employment decisions can constitute adverse employment action," *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375-76 (4th Cir. 2004) (citation and internal quotation marks omitted), the "typical requirements for a showing of an 'adverse employment action'" are "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion. . . ." *Boone v. Goldin*, 178 F.3d 253, 255 (4th Cir. 1999), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 67-68.  This limitation disqualifies many disciplinary actions, such as the written discipline measures at hand, from being considered an adverse

33

employment action. ADP did not take any disciplinary action against Appellant that was severe enough or that injured Appellant such that it rose to the level of an "adverse employment action."

Here, the only disciplinary measures Appellant received were a Verbal Warning on January 3, 2011 and the Written Warning three months later after failing to show improvement. These do not qualify as actionable "adverse employment actions" because neither disciplinary action was used as a basis to detrimentally alter the terms or conditions of her employment. For instance, Appellant lost no pay. She maintained the same position. Her job responsibilities were left unchanged. Moreover, ADP considered Appellant for every promotional opportunity in the wake of these disciplinary measures and did not preclude her from any promotional opportunities, including the Sales Executive position (which ultimately went to a female candidate) in April 2011. (JA 137). Because Appellant cannot show any tangible effect on her employment, she cannot meet the threshold of an actionable claim.

Appellant maintains that "on the face of ADP's policies for verbal and written warnings, [she] was not eligible for transfer or promotion after she received the verbal warning on January 3, 2011." (AB 44). But Appellant fails to allege or argue how the warnings were in any way materially adverse or harmful to her. She had been provided the opportunity to interview for two promotions during the

34

previous six (6) months. (JA 136-137, 177-178). With respect to the second opportunity in March 2011, Appellant was allowed to interview for the position in April 2011 even though the application period had technically closed. Appellant has not alleged, nor is there any evidence of, any other promotional opportunity she sought or was denied from applying for. *See supra* 34. Indeed, Appellant only worked for two more weeks after she interviewed for the position in April 2011. She then went on medical leave until her resignation in January 2012.

Appellant also makes a convoluted argument as to how e-mails between ADP HR personnel and legal personnel somehow created an adverse employment action. Instead of deposing the HR and Legal personnel to understand the purpose of the e-mails, Appellant speculates. The e-mails in question discuss Appellant's performance and the proper written warning to be issued, all of which had to do with her past performance. Appellant's conclusion that "ADP never considered Potts eligible for the Sales Executive position" rests on nothing more than naked speculation. This is the same opportunity ADP allowed Appellant to interview for even though the application period was technically closed and the same position that ADP filled with a female once the interview process was complete. In sum, the verbal and written warnings do not qualify as adverse employment actions, and the District Court was correct in dismissing Appellant's claim of disparate discriminatory discipline.

### B. Appellant Failed To Carry her Burden of Coming Forward with Evidence that ADP Treated Similarly Situated Male Employees Differently.

To establish a prima facie case for disparate discipline based on gender, Appellant must establish: "(1) that [s]he is a member of a class protected by Title VII, (2) that the prohibited conduct in which [s]he engaged was comparable in seriousness to misconduct of employees outside the protected class, and (3) that the disciplinary measures enforced against [her] were more severe than those enforced against those other employees." *Cook v. CSX Transp. Corp*., 988 F.2d 507, 511 (4th Cir. 1993); *see also Moore v. City of Charlotte*, 754 F.2d 1100, 1105-06 (4th Cir. 1985). Appellant cannot show that her performance was comparable to others outside the protected class, and therefore, she cannot identify any similarly situated male employees who were treated more favorably.

Appellant was the worst performer on Trott's team. There were no similarly situated employees because none were at ZERO percent of plan. For Appellant to establish a prima facie case, she must show that her performance was comparable to other similarly situated District Managers, *i.e*., those who have "dealt with the same supervisor, [been] subject to the same standards, and … engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Haywood v. Locke,* 387 F. App'x 355, 359 (4th Cir. 2010) (internal quotation marks and

36

citations omitted). The decisive question is thus: "What was Appellant's performance as of January and April 2011 in comparison to other District Managers that reported to Trott?"

Based on the Sales Boards[15] Trott used to evaluate the "lagging" indicator (closed sales) of job performance, it becomes uncontrovertibly clear that *Appellant was the worst performer and the warnings were justified*. Appellant was at ZERO percent of goal when Trott issued her the verbal warning and PIP in January 2011. All of Trott's District Managers had a higher percentage of their year-to-date Plan than Appellant at the end of December 2010. Indeed, each of them far outpaced Appellant: Felicia Richardson (female) attained 129% of plan; Holly Gillis (female) attained 83% of plan; Rob Willet (male) attained 44% of plan; and Tony Holland (male) attained 40% of plan. *Lastly, Plaintiff attained 0% of plan*.[16] (JA 290;

---

[15] The Sales Boards (non-discriminatory criteria) were relied upon by Trott when making decisions regarding corrective actions for his sales team. (JA 414-415).

[16] Appellant contends that Trott offered her some sort of "quota relief" for the sick time she used in December 2010. ADP disputes this, and Appellant's own e-mail response to the Verbal Warning mentions nothing about "quota relief." (JA 198). Appellant contends that her "personal plan" included quota relief, but she never mentions it and in fact states "I'm counting December because it isn't over yet," meaning she planned on working harder in December. If this was agreed upon, certainly Appellant would have included this in her "personal plan" to get back on track. Nonetheless, any sort of "quota relief" would still place Appellant at 0% and in last place on the team.

413).[17]

Notably, while Appellant trailed in last place, the top performers on Trott's team were both female. Even the two male District Managers, Willett and Holland, performed well above Appellant.   Nonetheless, Trott issued Willett a verbal coaching (JA 123-124, 415), to which Willet responded by reaching 102% of year-to-date plan by the following month.  (JA 417).  It is undisputed that if Willet's performance did not immediately improve, he too would have been subjected to a corrective action.  (JA 415; 418).  It is also undisputed that Holland escaped a corrective action because he had the largest sales funnel ("leading" indicator) on Trott's team, and his year-to-date percentage doubled by February 2011. (JA 146-147).

Not only had Appellant failed to achieve any of her annual quota goals six months into the 2011 fiscal year, but she also had issues with her sales funnel. Indeed, the Verbal Warning Appellant signed went over this fact in detail.  Her poor sales funnel further differentiated her from the rest of Trott's team since it is undisputed that no similarly situated District Manager had issues with their sales funnel.  (JA 131-132).

---

[17] Ed Voelsing is included on the Sales Boards, but he was merely a Trainee and not a District Manager.

Faced with this data, Appellant attempts to minimize the figures because she claims they constitute a "point-in-time" of her performance. (AB 50). But not only is ZERO percent of her sales Plan midway through the fiscal year anything but an arbitrary "point-in-time," she is not in a position to decide what performance metrics are considered worthy indicators of her job performance.

Furthermore, Appellant had continued to underperform when she was issued her written warning on April 4, 2011. By the end of March 2011, Trott's District Managers and their respective percentage of year-to-date plan included: Felicia Richardson (female) at 206% of plan; Holly Gillis (female) at 125% of plan; Rob Willet at 93% of plan; Tony Holland at 75% of plan; *and lastly, Appellant at 60% of plan*. (JA 419). Again, Appellant was in last place with a substantial way to go with only one quarter left in the fiscal year. Her female gender had nothing to do with her performance or resulting corrective actions – as proven by two females again leading Trott's group.

On top of that, Appellant's status at 60% of her annual goal by March 2011 was largely due to a positive audit in January 2011. (JA 224). The positive audit credited Appellant's sales quota $142,000 and resulted from a deal from *the prior fiscal year*. (JA 409). Notably, even though Appellant did not self-generate the deal, Trott intervened to ensure that Appellant received credit. (JA 145; 409). As

Appellant admitted, but for this positive audit, Appellant's year-to-date achievement would have looked even more bleak:

> Q. So if we took those sales out [positive audit], $142,000, you have something like $2,000 worth of sales in January?
> A. Yes.
> Q. Okay. And the month before that was $200 in sales?
> A. Yes.
> Q. Okay. And you closed a deal it looks like in February, correct?
> A. Yes.
> Q. And then in March you're down to $300?
> A. Yes.

(JA 410).

Appellant continues to cherry pick numbers from reports that fit her needs and ignores the actual information undisputedly testified to and relied upon by Trott to make his decisions. She also ignores Trott's uncontroverted testimony that not only did he consider where the employee was in relation to plan, but also took into consideration lagging and leading indicators (sales funnel), lead generation, and active participation in team and regional meetings. These concerns are all documented in Appellant's verbal and written warning. (JA 197-198, 207-208).

Based on Trott's evaluation of legitimate, non-discriminatory business criteria, Appellant was issued a verbal warning and a written warning. The male comparators, whom Appellant believes were treated more favorably than she was, are not remotely similarly situated since Appellant was by far the worst performing

member of Trott's team. Therefore, Appellant has failed to establish her prima facie case of disparate discipline, and the District Court's decision should be affirmed.

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Pursuant to Fourth Circuit Local Rule 34(a), Appellee respectfully requests oral argument and represents that oral argument is warranted and will aid the Court's decisional process. This case involves multiple independent bases for affirmance of the decision below. Appellee submits that oral argument will assist the Court in addressing the issues presented.

## CONCLUSION

For all of the foregoing reasons, the Court should affirm the District Court's order granting summary judgment in favor of ADP.

Respectfully submitted,

/s/ Ted N. Kazaglis
Ted N. Kazaglis
*Counsel of Record*
Collin O'Connor Udell
JACKSON LEWIS P.C.
1400 Crescent Green, Suite 215
Cary, NC 27518
(919) 854-0044
Kazaglis@jacksonlewis.com

*Attorneys for Defendant-Appellee*

41

**Certificate of Compliance
With Type-Volume Limitation, Typeface Requirements, and
Type Style Requirements**

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 9,678 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Professional Edition 2010 in 14 points Times New Roman font.

*/s/ Collin O'Connor Udell*
Collin O'Connor Udell

42

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 12, 2015, I caused this Brief of Appellee ADP, Inc. to be filed electronically with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

*/s/ Collin O'Connor Udell*
Collin O'Connor Udell

43