RECORD NO. 14-2113

In The

# United States Court of Appeals

### For The Fourth Circuit

## ERIN POTTS,

*Plaintiff – Appellant*,

**v.**

## ADP, INC.,

*Defendant – Appellee.*

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF NORTH CAROLINA AT CHARLOTTE

―――――――――

## REPLY BRIEF OF APPELLANT

―――――――――

**Victoria Street Tolbert**
**LAW OFFICE OF VICTORIA**
  **STREET TOLBERT**
**6135 Park South Drive, Suite 510**
**Charlotte, North Carolina  28210**
**(704) 749-3135**

*Counsel for Appellant*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iii

REPLY TO APPELEE'S STATEMENT OF THE FACTS ....................................1

REPLY ARGUMENTS ..........................................................................1

    A.    ADP Fails to Justify the District Court's Ruling that the April 4, 2011 Written Warning was not a Retaliatory Adverse Employment Action ..............................................................1

          i.    Potts was <u>not</u> Counseled for Poor Performance after the January 3, 2011 Verbal Warning ................................2

          ii.    Potts' Performance Improved After January and Trott's Stated Reason for Issuing the April 4, 2011 Written Warning is Pretextual ...............................................3

          iii.    Potts' Protected Activity is the "But For" Reason that Trott Issued the April Written Warning .......................4

          iv.    The April Written Warning Made Potts Ineligible to Apply for Promotions and Transfers; a Reasonable Employee Could Find This Adverse ............................6

    B.    ADP Fails to Justify that it was Entitled to an Inference of Non-Discrimination by the District Court Under <u>Proud v. Stone</u>, 945 F.2d 796, 798 (4th Cir. 1991) .................................................9

          i.    Trott did <u>not</u> Hire Potts ...............................................9

          ii.    Trott did <u>not</u> Promote Potts or Give her Raises and Awards ...........................................................11

    C.    ADP Fails to Justify the District Court's Ruling that Potts has not Proven her Prima Facie Case for Failure to Promote Based on Gender .....................................................12

i.  ADP Mischaracterizes Potts' Deposition Testimony and ADP Sales Data ........................................................................ 13

ii.  Potts was <u>not</u> Verbally Coached by Trott in October 2010 when she Applied for one of the two SEM Promotions ........... 13

iii.  ADP Mischaracterizes the Powell Declaration because Powell's Promotion Decision were based, in part, on Feedback from Trott .................................................................. 14

D.  ADP Fails to Justify the District Court's Ruling that Potts has not proven her <u>Prima Facie</u> Case for Disparate Discipline Based on Gender ........................................................................... 16

i.  The January Verbal Warning and April Written Warning were Adverse Employment Actions ......................................... 16

ii.  The April 1, 2011 "Interview" was a Sham Interview ............. 19

iii.  Potts Identifies Two Male Compartors That Were Not Given Warnings for Poor Performance ..................................... 22

iv.  Trott's Expectations are not Legitimate and are a Pretext for Gender Discrimination ....................................................... 25

CONCLUSION ........................................................................................ 29

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# <u>TABLE OF AUTHORITIES</u>

**<u>Page(s)</u>**

## <u>CASES</u>

<u>Burlington Northern & Santa Fe Railway Co. v. White</u>,
548 U.S. 53 (2006)..................................................................8

<u>Inman v. Klockner Pentaplast of Am., Inc.</u>,
347 Fed. Appx 995 (4th Cir. 2009) .............................................27

<u>James v. Booz-Allen & Hamilton, Inc.</u>,
386 F.3d 371 (4th Cir. 2004) ......................................................16

<u>Mackey v. Shalala</u>,
360 F.3d 463 (4th Cir. 2004) .......................................................8

<u>Oest v. Illinois Dep't of Corrections</u>,
240 F.3d 605 (7th Cir. 2001) ......................................................17

<u>Proud v. Stone</u>,
945 F.2d 796 (4th Cir. 1991) ..................................................9, 12

<u>Warch v. Ohio Cas. Inc. Co.</u>,
435 F.3d 510 (4th Cir. 2006) ......................................................27

## REPLY TO APPELLEE'S STATEMENT OF THE FACTS

As the old idiom says the "Devil is in the details," which means that overlooking the essential details of a scheme or plan can cause serious problems later on. In this case, ADP has overlooked and/or ignored several key details of the facts and circumstances giving rise to this matter, which has caused its arguments to be materially flawed. As an initial matter, several of the statements that ADP uses to support its arguments are false assertions that are not supported by the record. ADP cannot rely on assertions, conjecture, or speculation to support its summary judgment arguments.

## REPLY ARGUMENTS

**A.     ADP Fails to Justify the District Court's Ruling that the April 4, 2011 Written Warning was not a Retaliatory Adverse Employment Action**

ADP attempts to argue that the April written warning was not an adverse employment action because a reasonable employee in these particular circumstances would not have been dissuaded from making or supporting a charge of discrimination. However, ADP's argument is conclusory in nature and neglects key details that are important when analyzing a Title VII retaliation claim. Therefore, ADP's retaliation argument is fundamentally flawed.

### i.  Potts was <u>not</u> Counseled for Poor Performance after the January 3, 2011 Verbal Warning.

ADP states that Potts had been continually counseled for months before the April written warning was issued.  (Response p. 22). However, the undisputed evidence shows that prior to Potts receiving Trott's April written warning (which is the subject of Potts' retaliation claim), no counseling had occurred between Trott and Potts since Trott had given the January verbal warning. (JA 349, 384-385.) Although the January verbal warning states that Trott was <u>supposed</u> to meet with Potts every Friday to evaluate Potts' progress, these meetings did not occur.  Even when Potts expressed concern to Trott about the data and performance indicators used to issue the January verbal warning, Trott refused to meet with her and Trott did not respond to Potts' concerns.  ADP's own documents confirm that <u>Trott did not counsel Potts</u>.  For example, in an email dated March 31, 2011, from Human Resources Business Partner ("HRBP") Hopkins to ADP attorney Franzblau and HR Director Penney, HRBP Hopkins confirms that **Trott did not have any discussions with Potts related to her performance because Hopkins had instructed Trott not to have any one-on-one performance discussions with Potts.** (JA 384-385; see bottom of JA 384 email dated March 31, 2011 6:23PM from Mariza Hopkins that continues to top of JA 385).  Moreover, HRBP Hopkins also states that **there have been no discussions with Potts related to her performance,** outside of the follow up call attorney Franzblau and HR Director

2

Penney had with Potts in February about Potts' internal ethics complaint against Trott filed on January 26, 2011.

Contrary to ADP's statements, Potts had <u>not</u> been continually counseled for months before the April written warning was issued. (Response p. 22). Similarly, the written warning was <u>not</u> the result of a long process of performance counseling (Response p. 23), and Trott had <u>not</u> counseled Potts in the 100 days after the January verbal warning (Response p. 26), nor did Trott otherwise indicate to Potts that her performance had not improved. The record does not support ADP's conclusory assertions, and such unsupported assertions should be disregarded.

**ii.    Potts' Performance Improved after January and Trott's Stated Reason for Issuing the April 4, 2011 Written Warning is Pretextual.**

Simply put, the April written warning <u>for failing to show improvement</u> was a surprise to Potts because, other than refusing to talk to her about her improved performance, Trott gave no indication that he did not recognize that Potts' performance had improved. And, indeed, Potts' performance <u>had</u> improved. According to the Sales Boards which Trott used to evaluate his team's performance, in January 2011, Potts obtained 368% of her monthly plan and Potts went from 0% to 44% of her year-to-date ("YTD") sales plan. (JA 207). Moreover, by week 35 of fiscal year 2011 (February 2011), Potts obtained 197% of her monthly plan and achieved 65% of her YTD sales plan, according to the Sales Boards. (JA 417).

3

On March 28, 2011, Potts received an email from ADP's Vice President Ken Schmidt stating that she had received a regional award of Champion's Dinner because her third quarter sales performance (from January to March 2011) was 120% of plan or greater. (JA 369-371).

Given that Potts' performance had improved, the April written warning was unwarranted. Moreover, "lack of improved performance" cannot be the real reason that Trott issued the April written warning because Potts' performance had improved, as evidenced by ADP's Sales Boards and Potts' regional award recognition. Therefore, not only was the April written warning unwarranted, it was also not legitimate. These are the facts, according to ADP's own email documentation and limited Sales Boards produced in discovery and in the record on appeal.

### iii.  Potts' Protected Activity is the "But For" Reason that Trott Issued the April Written Warning.

The facts also show that Trott continued to refuse to discuss Potts' improved performance and Trott did not address Potts' concerns expressed in her January 26, 2011 internal ethics complaint about the data and performance indicators used to issue the January verbal warning. Similarly, after February 2011, Potts did not receive any feedback from HR or the legal department regarding the progress of her internal complaint against Trott filed in January.

4

On March 7, 2011, Potts filed a Charge of Discrimination with the EEOC. On March 24, 2011 Potts sent an email to Trott telling him that she had obtained an attorney and filed an EEOC Charge on March 7, 2011.  (JA 350-351).  According to Trott's own deposition testimony, Trott indisputably became aware of Potts' EEOC Charge on March 24, 2011, the day Potts sent him the email (JA 135). ADP agrees that Trott testified that he was not aware of the EEOC Charge until Potts herself told him in an email (and such email was sent on March 24, 2011 according to the record).  (Response p. 20).  The very next day, on March 25, 2011, Trott wrote the first draft of his written warning to Potts, which he eventually delivered to her by email on April 4, 2011.  These are the facts, according to ADP's own email documentation, which are part of the record, and are not in dispute.

The above facts show that Potts' performance had improved since receiving her verbal warning in January.  In March of 2011, Potts received recognition for a regional award because her third quarter sales performance (from January to March 2011) was 120% of plan or greater.  Despite her improved performance, Trott gave Potts the April written warning.  Trott began drafting the April written warning on March 25, 2011 – the very next day after Trott found out that Potts had filed an EEOC Charge, according to his own testimony.

Since "lack of improved performance" cannot be the real reason that Trott issued the written warning, as ADP's Sales Boards and email documentation show

that Potts' performance had improved, a jury could reasonably conclude that Potts' protected activity of filing an EEOC Charge (which Trott learned about on March 24, 2011, according to his own testimony), was the "but for" reason that Trott began drafting the written warning the very next day on March 25, 2011.

### iv. The April Written Warning Made Potts Ineligible to Apply for Promotions and Transfers; a Reasonable Employee Could Find This Adverse.

ADP tries to argue that Potts failed to show how the written warning was in any way materially adverse or harmful to her because Potts was provided the opportunity to interview for two promotions during the previous six months <u>before</u> the written warning was issued. However, ADP misses the mark with this argument because these alleged "interviews" that occurred <u>prior to</u> the retaliatory act (the April 4, 2011 written warning) are irrelevant to Potts' retaliation claim.

The April written warning at issue in Potts' retaliation claim was initially drafted by Trott on March 25, 2011 and delivered by Trott via email on April 4, 2011. In the April written warning, Trott states "until your job performance reaches an acceptable level, **<u>you will not be eligible to apply for other jobs or otherwise be considered for job transfer or promotion opportunities</u>**." (JA 364).

6

Trott's April written warning is based on ADP's HR Policy which states: "[a]ssociates on corrective action (excluding coaching discussion) are not eligible for transfer or promotion." (JA 258).

Therefore, Trott's written warning was materially adverse to Potts because, in accordance with ADP's HR Policy, the April written warning issued by Trott made Potts ineligible to even apply for other jobs or otherwise be considered for job transfer or promotional opportunities that became available after April 4, 2011. Moreover, ADP's HR policy on corrective actions harmed Potts because the promotional and transfer restrictions of Trott's April 4, 2011 written warning are based on ADP's HR policy.

Consequently, after the retaliatory act of giving Potts a written warning on April 4, 2011, she was not allowed to apply for any promotions or transfers. This is stated in ADP's policy and it is clearly stated by supervisor Trott in the written warning. The record in this case is clear that Potts was not allowed to apply for any promotions or transfers after April 4, 2011, nor did she attempt to apply. This is not in dispute and why ADP is trying to confuse this issue is not clear.

This case is simple – in a Title VII retaliation context, the April written warning issued by Trott "might well have dissuaded a reasonable worker from making or supporting a charge of discrimination" when, as here, such written

warning made Potts ineligible to apply for another job, or even transfer from under Trott's discriminatory supervision.

As ADP notes, the particular circumstances in any given situation must be considered when determining whether a reasonable employee would consider a challenged employment action to be adverse. To establish a prima face case for retaliation under Title VII, a plaintiff must show: (1) she engaged in a protected activity; (2) her employer acted adversely against her; and (3) the protected activity was causally connected to the employee's adverse action. Mackey v. Shalala, 360 F.3d 463, 469 (4th Cir. 2004). With regard to element (2), a plaintiff need only show that the challenged adverse employment action "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53, 68 (2006).

Based on the particular circumstances of this situation, a reasonable employee might well conclude that (1) the April written warning was not based on legitimate reasons since, according to the Sales Boards and a company regional award received by Potts, Potts' performance had improved since the January verbal warning; (2) the April written warning was drafted by Trott the very next day after Trott indisputably became aware of Potts' EEOC Charge because, according to Trott's testimony, he became aware of Potts' EEOC Charge on the day she sent him the email (on March 24, 2011), and he began drafting the written warning the

8

very next day (on March 25, 2011); (3) Potts' protected activity of filing her EEOC
Charge was the "but for" cause of the written warning because the stated reason for
the April written warning (lack of performance) could not rationally be the true
reason since Potts' performance had improved according to ADP's documentation;
and thus (4) the April written warning issued by Trott was in retaliation for Potts'
filing of her EEOC Charge and is, therefore, an adverse employment action for
purposes of Potts' Title VII retaliation claim. Consequently, the district court's
grant of summary judgment dismissing Potts' retaliation claim should be reversed.
The district court's rulings regarding Potts' retaliation claim are in error, and this
matter should be remanded to district court for trial or further proceedings.

**B.    ADP Fails to Justify that it was Entitled to an Inference of Non-Discrimination by the District Court Under <u>Proud v. Stone</u>, 945 F.2d 796, 798 (4th Cir. 1991)**

ADP argues that Trott, the alleged discriminator here, hired Potts and gave
her promotions, pay raises, and awards and, therefore, ADP is entitled to an
inference under <u>Proud</u>. (Response p. 24). However, again ADP's argument
neglects key details that are important to this issue – namely, ADP ignores its very
own HR documentation.

**i.    Trott did <u>not</u> Hire Potts.**

First, ADP attempts to argue that Schmidt, ADP's Vice President of Sales
for the Carolina Region, did not hire Potts. ADP cites Trott's testimony as

evidence that Trott was part of the team that hired Potts.   (Response p. 24). However, when testifying about Potts' hire, Trott appeared to not be sure about some details, as he "imagined" that Potts would have interviewed with 4 other sales leaders, all of whom would have reported to Ken Schmidt.   Trott further hypothesized that Potts would have had individual interviews, all leading up to the final interview with Ken Schmidt, ADP's Vice President of Sales for the Carolina Region at the time. (JA 108-109).

On the other hand, when VP Ken Schmidt testified about Potts' hire, Schmidt stated unequivocally:  "I hired her [Potts]."  Schmidt was very clear on the fact that Schmidt hired Potts. (JA 233). Schmidt also testified that Potts might have started with individual interviews with other sales leaders, but "ultimately" Schmidt interviewed Potts and Schmidt hired her.

Moreover, when Schmidt hired Potts on June 13, 2005, Trott was not a sales leader at that time.  According to ADP's documents, Trott was a Major Account DM (JA 295), and was not supervising a sales team until approximately three months after Potts was hired.

Both Schmidt and Trott are ADP's witnesses.  Both agree that Schmidt would have had the final interview with Potts. It is undisputed that Schmidt was ADP's Vice President of Sales of the Carolina Region at the time, and Schmidt unequivocally states that Schmidt hired Potts.

10

**ii.      Trott did <u>not</u> Promote Potts or Give her Raises and Awards.**

While ADP argues that Trott promoted Potts and cites the self-serving testimony of Trott (the alleged discriminator here) to support this claim, ADP's internal HR documents show that Trott never promoted Potts.  (JA 297-298).  The only promotion Potts received was in 2005 while under the supervision of Pete Baney.  When Potts came to Trott's team on July 17, 2008, HR documents prove that this was a lateral move (JA 297 – 298), and ADP's Answer to allegation 13 of Plaintiff's Complaint admits this (compare JA 19 with JA 42; compare allegation 13 of Plaintiff's Complaint with ADP's Answer to allegation 13).  Potts' job was merely reclassified from up-market client DM to major account up-market DM. (JA 298).

Finally, ADP claims, without support, that Trott gave Potts raises and awards.  There is no evidence in the record to support such statements and they are, indeed, not true.  Any recognition that Potts received was at the **<u>regional level</u>** based on her sales performance, and there is no evidence that Trott gave Potts an award or raise.  Therefore, Potts respectively requests that this Court disregard such unsupported claims.

This issue is simple – Trott did not hire or promote Potts; Trott did not give Potts any awards or raises.  ADP's own witness testimony and HR documents establish that Trott did not hire or promote Potts, or give her awards or raises.

Therefore, the cases and law ADP cites to support its arguments are simply not applicable to the facts of this case.

It appears that ADP is trying to refute its own evidence (HR documents and Vice President's testimony) with the testimony of the discriminator, David Trott.[1] On summary judgment, it is not the district court judge's function to weigh the evidence himself and determine the truth of the matter, but rather the district court must only determine whether there is a genuine issue for trial.

Here, Potts has come forth with specific facts, ADP's own witness testimonies and HR documents, to show that Trott did not hire or promote Potts, and therefore ADP is <u>not</u> entitled to any inferences under <u>Proud v. Stone</u>.

**C.    ADP Fails to Justify the District Court's Ruling that Potts has not Proven her <u>Prima Facie</u> Case for Failure to Promote Based on Gender**

ADP argues that Potts has failed to present evidence to support that gender played any role in ADP's decision not to promote her to one of the two SEM promotions in 2010. ADP further argues that Potts has not presented any evidence to prove that Powell's decision was based on discriminatory reasons. However, ADP mischaracterizes several deposition testimonies, as wells as its own sales data, to make its arguments.

---

[1] However, even Trott agreed during his deposition that Schmidt would have had the final interview with Potts when she was hired.

i.     **ADP Mischaracterizes Potts' Deposition Testimony and ADP Sales Data.**

ADP states that Potts testified that <u>at the time she was denied the SEM</u> <u>position</u>, she did not feel that anyone at ADP treated her differently in any respect due to her gender. Although ADP accuses Potts of mischaracterizing deposition testimony, it is actually ADP that has engaged in such mischaracterization by omitting key details of the testimony it alleges to cite.

In this case, Potts testified that <u>prior to 2008</u>, she did not feel that she was being treated differently because of her gender.  However, at the time that Potts interviewed for the SEM promotion in 2010, Potts never testified as ADP states. Defense counsel never asked Potts whether she believed that she was being discriminated against in 2010.  The testimony that ADP cites is referring to Potts' feeling in 2008, not in 2010 when she was discriminatorily denied the SEM promotion. (JA 70-71 and 75).  Therefore, Potts never testified as ADP states, and ADP's mischaracterization of Potts' deposition testimony is improper.

ii.    **Potts was <u>not</u> Verbally Coached by Trott in October 2010 when she Applied for one of the two SEM Promotions.**

ADP also states that at the time Potts interviewed for one of the two SEM promotions in October 2010, she was being verbally coached by Trott.  (Response p. 14, 28).  ADP supports this position with the deposition of Trott at JA 119-120; however, the testimony cited does not speak about any counseling allegedly done in October 2010.  Trott testifies about the January verbal warning, which was

13

initially discussed in late December 2010, but does not state that he verbally counseled Potts in October 2010. Therefore, there is no evidence in the record to support that Trott verbally coached Potts in October 2010 (at the time she applied for one of the two SEM promotions), and Potts respectively requests that this Court disregard ADP's unsupported assertion. ADP cannot rely on assertions, speculation, or conjecture to support its summary judgment arguments.

The only documentation in this case, which was produced by ADP in discovery and in the record, shows that Potts was at 100% of her YTD plan during this time period – see Sales Board for September 2010, which was the month immediately before she applied for the SEM promotions. (JA 288). Moreover, in June 2010, Potts achieved 111% of her 2010 YTD plan (JA 427), and in the second half of FY 2010, Potts had sold $619,600 worth of business, out-performing most of her peers, including the male comparators on her team. (JA 427; Robert Willett only sold $450,600 worth of business and Tony Holland only sold $142,900 worth of business in FY 2010). Therefore, at the time Potts applied for the SEM promotions in October 2010, Potts had recently achieved strong sales performance and there is no evidence that she was being verbally coached.

### iii. ADP Mischaracterizes the Powell Declaration because Powell's Promotional Decisions were based, in part, on Feedback from Trott.

Lastly, ADP argues that Powell's decision not to select Potts for one of the two SEM promotions was based on non-discriminatory criteria. However,

Powell's declaration states that he based his decisions on, among other things, feedback from an applicant's current manager. ADP concedes this point in its Response Brief at pp. 27-28. Therefore, according to ADP's own witness, Powell's decision not to hire Potts was based, in part, on feedback from Trott, who was Potts' manager at the time. Trott is the very same manager that subjected Potts to retaliation and discriminatory disparate discipline based on her gender in violation of Title VII. Therefore, because Powell admits that his decision not to select Potts was based on feedback from David Trott, then, necessarily, Trott's alleged discriminatory animus based on Potts' gender played a role in Powell's decision not to select Potts for one of the two October 2010 SEM promotions.[2]

While ADP accuses Potts of mischaracterizing deposition testimony, ADP omits key details of the testimony it attempts to cite and overlooks the input that

_____

[2] ADP incorrectly concludes that Potts has abandoned her failure to promote claim with respect to the Sales Executive role she allegedly interviewed for on April 1, 2011. However, ADP's argument misses the mark again because Potts never alleged such a claim. Potts believes, and since receiving discovery from ADP Potts has always believed, that the April 1, 2011 "interview" for the Sales Executive position was a sham. According to ADP's HR Policy as well as the emails of ADP's HR professionals and upper management, Potts was not eligible for promotion or transfer after she received the verbal warning from Trott on January 3, 2011. Therefore, when Potts interviewed on April 1, 2011 she was not eligible for this promotion, according to HR Policy which is confirmed by the statements contained in emails between ADP's HR professionals and upper management. Therefore, ADP never considered Potts eligible for the Sales Executive promotion. The "interview" ADP gave her on April 1, 2011 was a pretext, or sham, to disguise the fact that the January 3, 2011 verbal warning made her ineligible for transfer or promotion. See more in depth discussion under Issue D, infra. (JA 372-387).

Trott's discriminatory feedback had on Powell's decision not to select Potts. The district court's rulings on summary judgment regarding this issue should be reversed and this case should be remanded to the district court for trial or further proceedings.

**D.    ADP Fails to Justify the District Court's Ruling that Potts has not proven her <u>Prima Facie</u> Case for Disparate Discipline Based on Gender**

ADP argues that the disparate discipline at issue in this case, namely the January 3, 2011 verbal warning and the April 4, 2011 written warning, were not adverse employment actions because Potts did not suffer any loss of pay, benefits, or promotional opportunities. (Response pp. 23, 33). ADP tries to convince this Court that the warnings she received did not materially alter the terms or conditions of Potts' employment (Response p. 42). However, ADP's argument is fundamentally flawed and ignores Fourth Circuit Title VII precedent regarding reprimands and warnings.

**i.    The January Verbal Warning and April Written Warning were Adverse Employment Actions.**

This Court has explained that where a reprimand or warning has a "tangible job consequence," such as "<u>**ineligibility for**</u> job benefits like <u>**promotion**</u>, transfer to a favorable location, or an advantageous increase in responsibilities," such reprimand or warning constitutes an adverse employment action. <u>James v. Booz-Allen & Hamilton, Inc.</u>, 386 F.3d 371, 376 (4th Cir. 2004) (where an act that has

the consequence of "**a decrease in** compensation, job title, level of responsibility,

or **opportunity for promotion**," such act is an adverse employment action under

Title VII); see also Oest v. Illinois Dep't of Corrections, 240 F.3d 605 (7th Cir.

2001) (where consequence of reprimand is ineligibility for job benefits like

promotion, transfer to a favorable location, or an advantageous increase in

responsibilities, such reprimand is an adverse employment action).

In this case, ADP's HR Policy states that "[a]ssociates on corrective action

(excluding coaching discussion) are **not eligible for transfer or promotion**." (JA

254). A corrective action includes a verbal warning, written warning, and

dismissal. Therefore, when Trott gave Potts the January verbal warning (which

was a corrective action according to ADP HR Policy), Potts was not eligible for

transfer or promotion. Similarly, when Trott gave Potts the April written warning

(again, a corrective action according to ADP HR Policy), Potts was not eligible for

transfer or promotion. ADP appears to argue that being ineligible for a promotion

or transfer is not enough to qualify for an adverse employment action. ADP

attempts to argue that to qualify, Potts must actually apply for a position (that

company policy and her supervisor stated that she was not eligible to apply for)

and be denied. ADP's argument suggests that Potts would have to violate

company policy (by applying for a position that policy says she can't apply for)

and also go against the directive of her supervisor to get Title VII protection. But

17

both common sense and this Court have explained that when a warning has a tangible job consequence such as not being eligible for a promotion or transfer, this, by itself, is enough to detrimentally alter the terms and conditions of employment.

As discussed supra, the record is clear that Potts was not allowed to apply for any promotions or transfers after April 4, 2011, nor did Potts attempt to. Trott states in the April 4, 2011 written warning that Potts is **not eligible to apply for other jobs or otherwise be considered for job transfer or promotion opportunities**. (JA 389). This is not in dispute. Consequently, the April 4, 2011 written warning was sufficiently substantial to amount to a discriminatory adverse employment action under the Title VII precedent announced by this Court.

To disprove that the January 3, 2011 verbal warning was a discriminatory adverse employment action, ADP additionally argues that because Potts was allowed to "interview" for a promotion on April 1, 2011, such verbal warning was not adverse. Even though ADP's policy states that the January verbal warning disqualified Potts from promotional opportunities, ADP states that Potts was not, in fact, disqualified because ADP allowed her to allegedly "interview" for a promotional opportunity on April 1, 2011. (Response p. 34). However, the facts and circumstances surrounding this alleged "interview" show that ADP did not consider Potts eligible for such promotion at the time.

18

### ii.    The April 1, 2011 "Interview" was a Sham Interview.

The facts and circumstances show that on March 29, 2011, the day after receiving the Champion's Dinner regional award recognition, Potts inquired with her managers about a Sales Executive role she learned about (also referred to as an "inquiry email").  In response to Potts' inquiry email, HRBP Hopkins forwards a copy of said inquiry email to the legal department and responds to Potts' managers as follows:  "Obviously, with [Potts] current performance issues and the fact that we are moving to written warning, **[Potts] is not eligible to apply for any opportunities**." (JA 372). Importantly, ADP District Vice President Jim Neve responds "Does she represent what a leader is required to be?  Not in the least bit."

Then, the very next day on March 30, 2011, HRBP Hopkins sends HR Director Penney an email with the subject "SENDING TO ERIN – RE: Consideration for Sales Executive."  Later that same day, HRBP Hopkins sends an email to Potts telling her that she could apply for the previously closed but allegedly reopened Sales Executive position. (JA 376).

Although Hopkins had stated that, <u>obviously</u>, **Potts was not eligible to apply for any opportunities** given her verbal warning and pending written warning, now, twenty-four (24) hours later, Hopkins is consulting with HR Director Penney on how to draft an email to Potts to inform her that HR has reopened the Sales Executive position so that Potts could apply?  There are no

documents in the record which state why Hopkins decides to send the March 30, 2011 email. There are also no documents in the record which state whether Hopkins heard back from the legal department after she forwarded Potts' inquiry email to the legal department. Lastly, there are also no documents in the record which state why ADP decided to reopen the already closed position and allow Potts to submit her resume and allegedly "interview."

All we know is that Hopkins drafts her March 30, 2011 email to Potts not only in contradiction to ADP's stated policy on verbal and written warnings – such policies which Hopkins almost verbatim recites in her March 29, 2011 email – but Hopkins' March 30, 2011 email is also in contradiction to the thoughts of ADP's District Vice President Jim Neve, who stated that Potts did not represent what ADP wanted in a leader. (JA 372).

On or about March 31, 2011, Hopkins sends Potts an invite to "interview" for the Sales Executive position on Friday, April 1, 2011 at 3:30 PM with Trott, Schmidt, Pete Baney, and Hopkins. On the very same day, Hopkins also exchanges emails with HR Director Penney and attorney Franzblau regarding the wording and timing of the written warning to be presented to Potts. Penney suggests that the written warning be given on Monday, April 4, 2011, the next business day after Potts is to have her "interview" with Trott, Schmidt, Baney and

Hopkins.  Hopkins agrees, and HR Director Penney reiterates that presenting the written warning on Monday, April 4, 2011 "will be cleaner." (JA 383-386).

As planned, on Monday, April 4, 2011, the very next business day after Potts interviewed for the previously closed, and then allegedly reopened, Sales Executive promotion, Potts was told by Hopkins that she had not received the promotion to Sales Executive.  The very same day, Trott sends an email to Potts attaching the written warning, which Trott began drafting eleven (11) days prior – on March 25, 2011.   The written warning presented by Trott is now dated April 4, 2011.

These facts and any inferences to be drawn from these facts, viewed in a light most favorable to the non-movant Potts, show that ADP never considered Potts eligible for the Sales Executive position – neither at the time HRBP Hopkins sent her the email allowing her to submit her resume on March 30, 2011, nor at the time upper management allegedly "interviewed" her on April Fool's Day.

Therefore, although the January 3, 2011 verbal warning allowed Potts to have a sham "interview", the email documentation shows that the January verbal warning also made Potts ineligible to apply for transfer and promotional opportunities.  The "interview" ADP gave Potts on April 1, 2011 was a pretext, or sham, to disguise the fact that the January 3, 2011 verbal warning made her ineligible for transfer or promotion and it is insulting that ADP argues that this

sham "interview" somehow proves that the January verbal warning was not an adverse employment action. ADP's own HR policy, the statements of ADP's HR personnel, as well as the statement of ADP's upper management, show that Potts was not eligible to apply for promotion or transfer after she received the January verbal warning.

Both the January verbal warning and the April written warning were adverse employment actions for purposes of Potts' disparate discipline claims.

### iii.  Potts Identifies Two Male Comparators That Were Not Given Warnings for Poor Performance.

ADP argues that Potts has not identified any similarly situated male employees who were treated more favorably than her. (Response p. 23-24). However, Potts has identified both Robert Willett and Tony Holland as comparators. ADP further argues that because Potts was allegedly the worst performer at 0% of her YTD plan on the December Sales Boards, there are no comparators because no one else was at 0% of YTD plan on a sales board. ADP attempts to argue that, in a gender discrimination case, Trott's overall treatment of Potts compared to her male teammates is not important. ADP opines that the only important issue is Trott's treatment of Potts (compared to others) on the day(s) Trott decided to give her warnings. Therefore, ADP argues that the decisive question on this issue is: "What was [Potts'] performance as of January and April 2011 in comparison to other District Managers that reported to Trott?" Ironically,

however, ADP failed to produce the Sales Boards data for January 2011 and April 2011 which could answer that very question.

Based on the Sales Boards data ADP did produce, the record is clear that during the months when two male comparators' performance was equal to or worse than Potts, these male comparators were not given verbal or written warnings.

The following is a chart summarizing the YTD percentages of Potts, Willett, and Holland, as well as the warnings given by Trott:

|  | Sept 2010 | Dec 2010 | March 2011 |
|---|---|---|---|
| Potts | 100% YTD | 0% YTD (because of no-start) | 58% YTD |
| Willett | 32% YTD | 44% YTD | 91% YTD |
| Holland | -9% YTD | 40% YTD | 74% YTD |
| Warning Issued by Trott | No Warnings | Potts received Verbal Warning | Potts received Written Warning |

In September 2010, Trott did not issue any warnings, even though Holland's performance was at negative nine percent (which is worse than 0%)!  On January 3, 2011, Trott presents Potts with a verbal warning for December 2010 YTD percentage, even though he knows Potts had a technical no-start and had been out on medical leave.  Moreover, Trott issued no warnings to Willett and Holland, even though they are performing under 100% of YTD plan and only achieved 44% and 40%, respectively.  Willett only received coaching, which is very different from a verbal warning because, with "coaching", an employee is still eligible for

transfer and promotion. (JA 258). Moreover, once an employee receives a verbal warning, the next instance of unsatisfactory performance will lead to a written warning, which was the case for Potts. (JA 254, 258).

Fast forward to April 4, 2011, Trott presents Potts with a written warning for her March 2011 YTD percentage, even though Potts had obtained 58% of YTD plan. When Willett and Holland were at 44% of YTD plan and 40% of YTD plan (lower than Potts' 58%) respectively, neither one of them received a verbal or written warning. Moreover, although Willett and Holland are at 91% and 74% of plan at that point, they are still under plan because they are supposed to be at 100% of YTD plan. While at 58% of her YTD plan, Potts had sold $243,500 worth of business, and Holland had only sold $175,000 worth of business; therefore, in terms of dollars in the door, Potts was out-performing Holland at that time.

ADP's own DM sales data shows that there were male DMs who did not achieve 100% of their YTD sales plans during several given weekly snap shots, and there was at least one male on Potts' team not selling as much as Potts; however, Potts was the only DM who received warnings from Trott. The simple truth is that DMs were compensated for YTD performance on an annual basis, and their commissions were based on net sales. According to Potts' Salesforce report ("DM Scorecard") dated April 4, 2011 (for week 41 of fiscal year 2011), Potts had $404,000 in closed YTD sales. (JA 200). Trott clearly stated the performance

expectations for all DMs in Potts' verbal warning: "The expectations that were set for you [Potts] and the team are: <u>Above plan sales performance</u>. Monthly, Quarterly & Annually." (JA 197-198). Yet Willett and Holland never received a verbal or written warning for their poor monthly, quarterly, and YTD performance.

As discussed above, clearly, other male DMs were not obtaining 100% of their YTD sales plans at any given weekly snap shot; yet Potts was the only one who received warnings from Trott. Therefore, Potts has presented sufficient evidence that other male DMs engaged in comparable conduct as she did, yet were not disciplined by Trott in the same manner as she was. The district court's rulings on summary judgment regarding this issue should be reversed, and this case should be remanded to the district court for trial or further proceedings.

**iv.    Trott's Expectations are not Legitimate and are a Pretext for Gender Discrimination.**

ADP argues about sales funnels and leading and lagging indicators. However, when Potts filed her internal ethics complaint back on January 26, 2011, Potts questioned the validity of these alleged indicators and argued that they were not legitimate expectations. ADP completely ignores the contradictory sales data Potts produced in the Neve Report Card, another internal ADP sales report (and central to Potts' internal ethics complaint), which showed very different numbers than Trott reported for the same time period – week 26 of fiscal year 2011 (December 2010). The Neve Report Card reports DM gross sales and, as of

December 2010, it showed that Potts' gross sales were $133,900, which is vastly different than the alleged ZERO dollars sold that Trott reported. The December 2010 Neve Report Card also showed that Potts' gross sales exceeded two of her male teammates:  Willett had gross sales of $96,100; and Holland only had gross sales of $90, 900. (JA 329).

Moreover, Potts' DM Scorecard for week 41 of FY 2011 (dated April 4, 2011), shows that Potts had $404, 000 in closed YTD sales.  However, according to the written warning dated April 4, 2011, Trott alleges that ADP data showed that Potts had only achieved 58% of YTD plan at that time, and Sales Board data for week 41 of FY 2011 states that Potts only had $243,500 in sales, which is vastly different than the $404,000 that the DM Scorecard reports for Potts for the same time period.  In this Reply Brief, Potts continues to dispute the validity of these alleged expectations and the data used to discipline her. Interestingly enough, ADP has presented no documentation that disputes the Neve Report Card or Potts' DM Scorecard, nor have they presented evidence that supports or defines Trott's expectations.  ADP only relies on the testimony of Trott, the discriminator, to support its arguments.

"Although on summary judgment an employer is free to assert that the job expectation prong has not been met, nothing prohibits the employee from countering this assertion with evidence that demonstrates (or at least creates a

26

question of fact) that the proffered 'expectation' is not, in fact, legitimate at all. Thus, where application of the qualification or expectation element of the prima facie case seems to preclude an otherwise meritorious claim, the plaintiff is free to demonstrate that the employer's qualifications or expectations are not, in fact, 'legitimate.'" Warch v. Ohio Cas. Inc. Co., 435 F.3d 510, 516-517 (4th Cir. 2006) (concluding that the employee failed to create any genuine dispute on a pretext approach because employee did not show that expectations were a sham designed to hide the discriminatory purpose); see also Inman v. Klockner Pentaplast of Am., Inc., 347 Fed. Appx 995, 960 (4th Cir. 2009) (concluding that plaintiff presented sufficient evidence of pretext where plaintiff presented evidence from which a jury could conclude that the deficiencies that defendant claimed existed in plaintiff's work performance were exaggerated to cover up a discriminatory motive).

In the instant case, Trott alleges that he used Sales Boards to evaluate DM performances. Potts has shown, through ADP's own DM Sales Boards data, that there were male DMs who did not achieve 100% of their YTD sales plans during several given weekly snap shots; however, Potts was the only DM who received warnings from Trott. Even when Robert Willett showed minimal improvement – going from 32% to 44% of YTD plan – Willett did not receive any warnings. Moreover, even when Tony Holland was at -9% (negative nine percent which is

27

below 0%) of YTD plan, he did not receive a warning, nor did he receive a warning when he was at 40% of YTD plan and still below his monthly plan.

Moreover, in January 2011 and February 2011, Potts' performance improved – she received 368% and 197% of her monthly plans, respectively. In fact, in recognition of her strong sales performance, Potts received a regional award (for her January – March 2011 sales performance) on March 28, 2011, which was just days before she received Trott's written warning on April 4, 2011.

Through ADP Sales Boards data and the regional level award she received, Potts has presented evidence from which a jury could conclude that Trott's expectations were not legitimate and the deficiencies that Trott claimed existed in Potts' work performance were exaggerated to cover up his discriminatory motive.

Consequently, ADP's own documentation creates a genuine issue of material fact regarding whether Trott's expectations were legitimate, or whether such expectations were a pretext, or sham, for gender discrimination, where Trott treated male DMs more favorably than Potts. Therefore, the district court's rulings on summary judgment regarding this issue should be reversed and this case should be remanded to the district court for trial or further proceedings.

## <u>CONCLUSION</u>

For the reasons and authorities set forth above, Potts contends that summary judgment in favor of ADP was improperly granted. Potts respectively requests that the district court's rulings and grant of summary judgment in favor of ADP be reversed, and that this matter be remanded to the Western District of North Carolina for a jury trial or further proceedings.

This the 26th day of January, 2015.

Respectively submitted,

/s/ Victoria Street Tolbert
Victoria Street Tolbert/NC State Bar No. 32945
Law Office of Victoria Street Tolbert
Attorney for Plaintiff-Appellant Erin E. Potts
6135 Park South Drive, Suite 510
Charlotte, North Carolina 28210
p: 704.749.3135
e: vstolbert@vstlaw.com

## <u>CERTIFICATE OF COMPLIANCE</u>

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

[ X ] this brief contains [*6,895*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[    ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2007*] in [*14pt Times New Roman*]; *or*

[    ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: <u>January 26, 2015</u>            <u>/s/ Victoria Street Tolbert      </u>
                                                        *Counsel for Appellant*

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on this 26th day of January, 2015, I caused this Reply

Brief of Appellant to be filed electronically with the Clerk of the Court using the

CM/ECF System, which will send notice of such filing to the following registered

CM/ECF users:

Ted N. Kazaglis                         Collin O'Connor Udell
JACKSON LEWIS PC                        JACKSON LEWIS PC
1400 Crescent Green, Suite 215          90 State House Square, 8th Floor
Cary, North Carolina  27518             Hartford, Connecticut  06103
(919) 854-0044                          (860) 522-0404

*Counsel for Appellee*                  *Counsel for Appellee*

I further certify that on this 26th day of January, 2015, I caused the required

copies of the Reply Brief of Appellant to be hand filed with the Clerk of the Court.

/s/ Victoria Street Tolbert
*Counsel for Appellant*